UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

                         REPORT AND RECOMMENDATION

vs.

Charles William Prentice, Jr.,

        Defendant.        Crim. No. 09-343 (DWF/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge
pursuant to a general assignment, made in accordance with the provisions of Title 28
U.S.C. §636(b)(1)(B), upon the following Pretrial Motions of the Defendant:

    1.      The Defendant's Motion to Suppress Confessions or
              Statements in the Nature of Confessions.

    2.      The Defendant's Motion to Suppress.

    3.      The Defendant's Motion to Dismiss the Indictment
              on the Grounds that the Court does not have Subject
              Matter Jurisdiction.

    4.      The Defendant's Motion to Suppress the Indictment
              as Duplicitous.

A Hearing on the Motions was conducted on December 21, 2009, at which time, the Defendant appeared personally, and by Aaron J. Morrison, Esq., and the Government appeared by Clifford P. Wardlaw, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motions be denied.[1]

## II. Factual Background

In an Indictment that was filed on November 10, 2009, the Defendant was charged with one (1) Count of assault resulting in serious bodily injury, in violation of Title 18 U.S.C. §§113(a)(6), 1151, and 1153(a), see, Docket No. 1, and on January 13, 2010, before our ruling on the parties' pretrial Motions, the Government filed a Superseding Indictment. See, Superseding Indictment, Docket No. 33. As to the Defendant, the Superseding Indictment realleges one (1) Count of assault resulting in serious bodily injury, and adds one (1) Count of Child Endangerment in violation of Title 18 U.S.C. §§1151, 1153(a), 1153(b), and Minnesota Statutes Section 609.378,

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing briefing. Leave was granted, and the Defendant submitted a brief on January 4, 2010, and the deadline for the Government's passed, on January 7, 2010, without the Government submitting a post-Hearing response, and, accordingly, the Motions were taken under advisement at that time. See, Title 18 U.S.C. §3161(h) (1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-677 (8th Cir. 1995).

Subdivision1(2)(b)(1).  In addition, the Superseding Indictment charges a co-Defendant, Showy Shalette Johnson ("Johnson"), with one (1) Count of Child Endangerment, in violation of Title 18 U.S.C. §§1151, 1153(a), 1153(b), and Minnesota Statutes Section 609.378, Subdivision1(2)(b)(1).[2]

The Government alleges that the Defendant, and Johnson, are the parents and legal guardians of the alleged victim.  The alleged violations are said to have occurred between September 23, 2008, and November 3, 2008, on the Red Lake Indian Reservation ("Red Lake"), which is located within the territorial boundaries of this State and District.  As pertinent to the charges, and to the Motions now before us, the operative facts may be briefly summarized.[3]

---

[2]While the Superseding Indictment shortens the period of time in which the Defendant is alleged to have perpetrated the unlawful acts, the remaining language, as contained in Count One is the same as pled in the original Indictment, so the Defendant's objection as to the duplicitous nature of that Count remains viable.

[2]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court shall must its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991), cert. denied, 505 US 1228 (1992); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

At the Hearing on the Defendant's Motions, the Government presented the testimony of Michael J. Iverson ("Iverson"), who is a Special Agent with the Federal Bureau of Investigation ("FBI"), in the Bemidji Resident Agency, and who was involved in the investigation of the events that gave rise to the pending charges. The investigation and resulting charges relate to child abuse allegations against the Defendant.

Iverson testified that, on November 5, 2008, he interviewed the Defendant, along with Special Agent Timothy Ball ("Ball"), also a Special Agent with the FBI, at the Juvenile Detention Center, on the Red Lake Indian Reservation. As related by Iverson, the Detention Center is not currently operating as a detention facility, as nobody is currently housed there, and the FBI, and the Red Lake Law Enforcement Officers, generally use the facility for meetings and interviews. Iverson averred that, at the time of the interview, the Defendant was employed at the Red Lake Detention Center, which is located within a few meters of the Juvenile Detention Center.

Iverson testified that he did not arrange the meeting with the Defendant, but that either Ball, or Officer Leonard Red Cloud ("Red Cloud"), who is a Criminal Investigator with Red Lake Law Enforcement, contacted the Defendant in order to request an interview for the purposes of obtaining the Defendant's statement. The

Defendant agreed to the interview. Iverson did not know what Ball, or Red Cloud, said when they spoke with the Defendant for the purpose of arranging the meeting.

Iverson stated that, at the time of the interview, the Defendant was not informed that he did not have to talk to the FBI, and that he was not aware whether Red Cloud or Ball told the Defendant that he did not have to participate in the interview at the time that the meeting was arranged. Iverson further averred that, based upon his interactions with the Defendant, it was clear to him that the Defendant knew that he was not in custody at the time of the interview, and that the interview was not mandatory. The Defendant was not placed into custody, and he was never told that he was in custody. Iverson related that he viewed the Defendant as a person of interest in the investigation, although, as far as he was aware, nobody specifically informed the Defendant that he was a person of interest.

The Defendant transported himself to the Detention Center in his own vehicle, and Iverson and Ball met the Defendant in the parking lot upon his arrival. Iverson recounted that both he and Ball were in plainclothes at the time of the interview. Iverson was armed, but his weapon was not visible. Iverson testified that no weapon was visible on Ball, although he was not aware if Ball was armed. The interview was conducted in a meeting room within the Detention Center.

Iverson testified that the Defendant was not read his Miranda rights at any time prior to, or during, the interview, because he was not under arrest, and they had no intention of arresting him at that time. According to Iverson, the Defendant did not refuse to answer any questions, he was able to understand the Defendant, it appeared to Iverson that the Defendant understood the Agents, and that the Defendant did not appear to be under the influence of alcohol or drugs. Following the interview, the Defendant left in his own vehicle.

As related by Iverson, the FBI, United States Attorney's Office, Red Lake Family and Children Services ("Children Services"), Red Lake Courts, Red Lake Indian Health Services Hospital, and the Red Lake Women's Shelter, comprise a multi-disciplinary team for Red Lake, which meets once a month to collaborate and exchange information concerning the welfare of victims within Red Lake. Iverson testified that the present case was the subject of collaboration by the multi-disciplinary team. Iverson related that, during the course of the investigation of the Defendant, the FBI received medical records from Children Services, and that Children Services had taken custody of the Defendant's child, pursuant to a temporary hold resulting from the child abuse allegations. As a result of Children Services taking custody of the child, it also received the pertinent medical records, which were eventually disclosed

to the FBI. Iverson testified that he has been working in the FBI's Bemidji Resident Agency for two (2) years and, during that time, he has been involved in family violence cases. According to Iverson, medical records are routinely exchanged between Children Services, and the FBI, in family violence cases on the Red Lake Indian Reservation.

## III.  Discussion

A.  The Defendant's Motion to Suppress Statements.

1.  Standard of Review.  Government agents are not required to administer Miranda warnings to everyone they question.  See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984).  Once a suspect is in police custody and subject to interrogation, the suspect must be informed of his constitutional right to remain silent, and to be represented by legal counsel during questioning.  See, Miranda v. Arizona, supra at

473; see also, <u>Dormire v. Wilkinson</u>, 249 F.3d 801, 803-804 (8th Cir. 2001), cert. denied, 534 U.S. 962 (2001).

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>Stansbury v. California</u>, supra at 322, quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983). As the Court explained, in <u>United States v. Griffin</u>, 922 F.2d. 1343, 1347 (8th Cir. 1990), "[i]f [the Defendant] believed his freedom of action had been curtailed to a 'degree associated with formal arrest,' and that belief was reasonable from an objective viewpoint, then [the Defendant] was being held in custody during the interrogation." See also, <u>Stansbury v. California</u>, supra at 322; <u>United States v. Chamberlain</u>, 163 F.3d 499, 502 (8th Cir. 1998).

Under the law of this Circuit, the relevant factors, which are to be considered in making a determination of custody, include an accused's freedom to leave the scene, and the purpose, place, and length, of the interrogation. See, <u>United States v. Griffin</u>, supra at 1348-49. The most comprehensive list of factors was enumerated, as follows, in <u>United States v. Griffin</u>, supra at 1349:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the

suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

See also, United States v. Ollie, 442 F.3d 1135, 1137 (8th Cir. 2006); United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005); United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002).

The Court has regarded the first three (3) of the Griffin factors as mitigative in their effect upon the ultimate determination, for the presence, during the questioning, of one or more of those factors tends to weigh against a finding of custody. On the other hand, the remaining three (3) factors have been characterized as coercive in their effect, since those factors would tend to accentuate the existence of custody. Notably, the factors "are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract." United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005), citing United States v. Czichray, supra at 827. Instead, the Griffin factors serve as a guide in the resolution of the ultimate inquiry of "whether the defendant was restrained as though he were under formal arrest." United States v. Czichray, supra at 828.

In addition to whether <u>Miranda</u> is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. See, <u>Dickerson v. United States</u>, 530 U.S. 428, 433-34 (2000). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." <u>Dickerson v. United States</u>, supra at 434, citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973).

As the Supreme Court has explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.] See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961)("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant"). The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, [346 U.S. 156, 185] (1953).

<u>Id.</u> at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a <u>Miranda</u> warning has been given, see, <u>Withrow v. Williams</u>, 507

U.S. 680, 693 (1993); any elements of "police coercion" or overreaching, see, Colorado v. Connelly, 479 U.S. 157, 163-164(1986); the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367 U.S. 433, 441 (1961); the continuous nature of the interrogation, see, Leyra v. Denno, 347 U.S. 556, 561 (1954); and the capacity of the defendant to resist pressure or exercise free will, see, United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997); see also, Withrow v. Williams, supra at 693 (listing the applicable considerations). Lastly, the Government has the burden of proving, beyond a preponderance of the evidence, that a statement was voluntary. United States v. Wright, 706 F.2d 828, 830 (8th Cir. 1983).

      2.    Legal Analysis. We understand the Defendant to argue that he was effectively in custody, during the course of his interview and, in addition, that his statements were involuntary. The Government has acknowledged, as it must, that the Defendant was not advised of his Miranda rights, at any time prior to, or during, the interview. In addition, we accept, in the absence of any evidence to the contrary, that the Defendant's statements were made in response to direct questioning by law enforcement officials. Accordingly, the pertinent inquiry is whether the Defendant was in custody, so as to require a Miranda warning and, if not, whether his statements

were otherwise involuntary.  Given the totality of the circumstances, we find that our consideration of the <u>Griffin</u> factors weighs heavily in favor of a finding that the questioning of the Defendant was noncustodial.

Initially, we recognize that there is no evidence in the Record, which would reflect that the Defendant was advised that he was not under arrest, that he was free to terminate the interview at any time, or that he was free to leave at any time.  Here, notwithstanding that failure, we find nothing in the Record to indicate that the Defendant's freedom to depart was restricted.  Notably, nothing in the Record suggests that the Defendant was denied a request to move around, to take a break, or to end the interview and, given that the interview was conducted in a regular meeting room rather than an interrogation room, we find no basis for concluding that the Defendant would have felt that he was in custody, due to the location of the interview.

Moreover, while the interview occurred at the Juvenile Detention Facility, at the time of the interview, no one was being held in custody at that facility, and the interview took place in a regular meeting room rather than an interrogation room. See, <u>United States v. Mottl</u>, 946 F.2d 1366, 1370 (8th Cir. 1991)(finding that an interview conducted at FBI headquarters was noncustodial despite the agents' failure to inform the defendant that he was free to leave, and that he was free to terminate the interview

at any time). As our Court of Appeals has observed, "where there is no indication that the defendant's freedom to depart has been restricted, we have typically concluded that a police station interview was noncustodial." United States v. LeBrun, 363 F.3d 715, 723 (8th Cir. 2004), cert. denied, 543 U.S. 1145 (2005). Here, given the absence of any indication that the Defendant's freedom to depart was restricted, we conclude that the fact that the interview occurred within a law enforcement facility does not reflect that the interview was custodial in nature.

Most importantly, the police did not escort the Defendant to the meeting location. Rather, the Defendant voluntarily acquiesced to law enforcement's request for an interview, he drove his own vehicle to meet Agents Ball and Iverson at the Juvenile Detention Center, and he left, without hindrance, at the end of the interview. Compare, United States v. Cates, 251 F.3d 1164, 1167 (8th Cir. 2001)(noting that the defendant voluntarily arrived at the interview unescorted and left without hindrance as among the factors it considered in finding that the defendant was not in custody); United States v. Galceron, 301 F.3d 927, 930-931 (8th Cir. 2002)(same); United States v. Luken, 515 F. Supp.2d 1020, 1034 (D. S.D. 2007)(same).

As we previously noted, Iverson was not aware if anyone had told the Defendant that the meeting was voluntary but, nevertheless, Iverson believed that it

was clear from the circumstances that the Defendant was aware that the meeting was voluntary, and that the Defendant had arrived voluntarily. While Iverson's impression is not conclusive, since that the Defendant arrived at the station unescorted, and left on his own accord, we are persuaded that the evidence, viewed in totality, allows the reasonable inference that the Defendant was well aware that his cooperation was not mandatory.

Moreover, the Defendant was not arrested at the close of the questioning and, the Agents had no intention of arresting the Defendant when they requested the interview, or at any time during or after the interview. See, United States v. Sutera, 933 F.2d 641, 647 (8th Cir. 1991)(noting that "it is very important that the officers did not contemplate arresting [the defendant]," which indicates that the interview was just a part of the investigation), citing United States v. Rorex, 737 F.2d 753, 756 (8th Cir. 1984); United States v. Galceran, supra at 931(noting that the lack of arrest was a "very important factor weighing against custody."); United States v. LeBrun, supra at 722.

Turning to the remaining Griffin factors, we note that the Defendant has not specifically argued that, during any part of the interview, the Agents employed deceptive stratagems or strong arm tactics, nor is there any evidence that would

suggest as much. There is no evidence that Iverson or Ball threatened, or deliberately deceived the Defendant, questioned him in a manner that was designed to intimidate him, or otherwise acted so as to overbear his will. In addition, we conclude that the interview was not conducted in a police-dominated environment, given the Record, which reflects that only two (2) Agents were present, in plainclothes, at the time of the interview, and the fact that it was not conducted in a regular police station or interrogation room. Compare, United States v. Galceran, supra at 930("[T]he interview's setting was not police dominated, even though the interview took place at a police station."); United States v. Elzahabi, 502 F. Supp.2d 915, 922 (D. Minn. 2007), aff'd, 557 F.3d 879 (2009), cert. denied, --- U.S. ---, 129 S.Ct. 2781 (June 8, 2009)(even though the interview took place at the FBI office, "the interview took place in a break room rather than a typical interrogation room, [so] this factor does not weigh heavily toward finding that defendant was in custody). While we are mindful that Iverson was armed, there is no suggestion that any weapons were drawn, or brandished, at any point, and there is no indication that the Defendant expressed any objection or concern to either of the Agents about their being armed. See, United States v. Cates, supra at 1167 (8th Cir. 2001)(noting its consideration of the fact that

the officers were not in uniform and did not draw their weapons in finding an

interview noncustodial).

> As our Court of Appeals has advised:

> > [Oregon v. Mathiason, 429 U.S. 492, 495 (1977)] and
> > [California v. Beheler, 463 U.S. 1121, 1125 (1985)] teach
> > us that some degree of coercion is part and parcel of the
> > interrogation process and that the coercive aspects of a
> > police interview are largely irrelevant to the custody
> > determination except where a reasonable person would
> > perceive the coercion as restricting his or her freedom to
> > depart.

United States v. LeBrun, supra at 721.

Here, given the totality of the circumstances surrounding the questioning of the

Defendant, as we have detailed, we are persuaded that any coercive aspects of the

interview were minimal, and do not militate towards a finding that the Defendant was

in custody. In sum, we find and conclude, on this Record, that the Defendant could

not have reasonably concluded that he was under formal arrest at the time of his

interview on November 5, 2008, based upon an objective analysis of the Griffin

factors.

> Moreover, based mainly upon the same factors, we also find that the

Defendant's statements were voluntary. Notably, there is no evidence that the agents

engaged in deceptive or coercive strategies, much less conduct sufficient to have

overborne the Defendant's will. Furthermore, there no evidence in the Record to suggest that the Defendant was otherwise duped into cooperating with law enforcement, nor any evidence that the Defendant was denied any normal accommodations of daily living, or that the Defendant was experiencing any physical, or mental impairments, that would impact upon the voluntariness question.

We recognize that it is not clear from the Record how long the interview lasted, but there is nothing to suggest that the interview was unduly lengthy, nor has the Defendant specifically argued that it was. Quite notably, the Defendant fails to support his assertion, that his statement was involuntary, with any specific, and evidence-based, demonstration of coercion. As we have detailed, the Defendant's interview was plainly the product of his knowing election to cooperate with law enforcement.

In sum, we recommend that the Defendant's Motion to Suppress Statements be denied.

B. <u>The Defendant's Motion to Suppress Evidence</u>.

1. <u>Standard of Review</u>. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." <u>U.S. Const. Amend. IV</u>. Any person asserting

a Fourth Amendment protection "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 83 (1998), citing Rakas v. Illinois, 439 U.S. 128, 138-44 (1978); see also, United States v. Kuenstler, 325 F.3d 1015, 1020 (8th Cir. 2003), cert. denied, 540 U.S. 1112 (2004)("The Fourth Amendment protects 'against unreasonable searches and seizures,' but its protections are personal and cannot be asserted by persons lacking a 'legitimate expectation of privacy' in the place searched."); United States v. Green, 275 F.3d 694, 698 (8th Cir. 2001)("Fourth Amendment rights are personal and may not be asserted vicariously."), citing United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999).

"To establish a legitimate expectation of privacy, [a] defendant[] must demonstrate: (1) a subjective expectation of privacy; and (2) that this expectation is one that society is prepared to recognize as objectively reasonable." United States v. Green, supra at 699, citing United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995). In the absence of such a showing, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas v. Illinois, supra at 134.

2.  <u>Legal Analysis</u>.  Here, the Defendant moves to suppress the medical records of Y.P., the Defendant's daughter, and the alleged victim in this case, pursuant to the Fourth Amendment, and the Health Insurance Portability and Accountability Act ("HIPAA"), see Pub. Law No. 104-191, 110 Stat. 1936.

HIPAA was enacted in order to assure an individual's right to privacy in his or her medical records.  HIPAA provides that "[a] covered entity may not use or disclose protected health information, except as permitted or required by" the regulations.  See, <u>Title 45 C.F.R. §164.502</u>.  In turn, a covered entity is defined as a health plan, a health care clearinghouse, or a health care provider, that transmits health information electronically, in certain kinds of covered transactions.  See, <u>Title 45 C.F.R. §164.104</u>.  Accordingly, a law enforcement agency is not a covered entity, subject to the restraints on the use or receipt of protected medial information.  See, <u>United States v. Elliott</u>, --- F. Supp.2d ---, 2009 WL 5159587 at *8 (D. Md., December 23, 2009) ("Law enforcement agencies, including the office of the prosecuting attorney, are not covered entities under [HIPAA]"), citing <u>United States v. Abdallah</u>, 2009 WL 1918401 at *6 (S.D. Texas, July 1, 2009); <u>United States v. Mathis</u>, 337 F. Supp.2d 640, 645 (M.D. Tenn. 2005)(recognizing that the FBI is not a covered entity under HIPAA).  As such, we conclude that the Government's receipt and use of Y.P.'s

medical records is not covered by HIPAA's provisions and, in that respect, there has been no violation of HIPAA's guarantees by the Government, which would warrant the suppression of the alleged victim's medical records.

Moreover, although the exact method that Children Services received the information is not before us, we will assume, just for these purposes, that a covered entity disclosed Y.P.'s records to Children Services which, in turn, disclosed the records to the Government. Notwithstanding that assumption, HIPAA provides that a covered entity may use or disclose the "protected health information" without the written authorization of the individual under certain circumstances. See, Title 45 C.F.R. §164.512. One of those exceptions authorizes the disclosure of otherwise protected health information, by covered entities, to agencies authorized by law for receiving reports of child abuse or neglect. See, Title 45 C.F.R. §164.512(b)(1)(ii). In addition, the regulations permit disclosure of health information for law enforcement purposes, as required or permitted by law. See, Title 45 C.F.R. §164.512(f).

Here, the alleged violations occurred on Red Lake Indian Reservation, and involved an Indian parent and child, so a local protective services agency would have appropriately received the medical records pursuant to a report of child abuse. See,

Title 25 U.S.C. §§450f and 3210(b)(providing that Indian tribes may administer protective services pursuant to self-determination contracts); Hinsley v. Standing Rock Child Protective Services, 516 F.3d 668, 670 (8th Cir. 2008)(same); Red Lake Band of Chippewa Indians v. United States Dept. of Interior, 624 F. Supp.2d 1 (D. D.C. 2009)(recognizing that Red Lake has a Compact for self-governance with the Department of Interior).  Furthermore, local child protective services are required by Federal Statute to notify local law enforcement of such reports of child abuse, who are then required to notify the FBI of those reports.  See, Title 25 U.S.C. §3203. Accordingly, we find that no violation of HIPAA has occurred, since the medical records were disclosed, consistent with HIPAA regulations and other Federal Statutes, to Children Services, presumably for the purpose of reporting child abuse, which is a permitted disclosure that is clearly contemplated under the regulations.

While we have found no violation of HIPAA, as we have detailed, with respect to the disclosure or the Government's receipt of Y.P.'s medical records, we are further unpersuaded that any such violation would warrant the suppression of the medical records, in any event.  See, United States v. Elliott, supra at *7(HIPAA "was passed to ensure an individual's right to privacy over medical records, it was not intended to be a means for evading prosecution in criminal proceedings" and finding "that the

Government's interest in obtaining the requested records outweighs the defendant's right to withhold them and the records will not be excluded from trial on this ground."), quoting <u>United States v. Zamora</u>, 408 F. Supp.2d 295, 298 (S.D. Tex. 2006). Here, the Government clearly has an overriding interest in the investigation and prosecution of child abuse cases, that must override any interest a parent, who is accused of that child abuse, may have in the medical records, pursuant to HIPAA. All indications in the Record reflect that the medical records were received pursuant to lawful procedures, and accordingly, we find no violation of the Defendant's rights, with respect to the Government's receipt and use of the medical records at issue.[4]

---

[4]In his Memorandum submitted on January 4, 2010, the Defendant also asserted that he had not received copies of discovery, falling within Rule 16, Federal Rules of Criminal Procedure, from the Government. See, <u>Docket No. 32</u>. The Government represented at the Hearing that counsel for the Defendant was permitted to go through those materials in the Government's possession, which are subject to Rule 16, prior to the Hearing, which the Defendant did not dispute at that time. Accordingly, given the Defendant's failure to particularize what items, in particular, have not been disclosed or made available, and the fact that the Defendant admits that he has had access to those materials, we find no basis for suppression on the Record before us, which does not support the conclusion that the Defendant's substantial rights have been prejudiced. See, <u>United States v. Williams</u>, 902 F.2d 675, 677 (8th Cir. 1990)(District Court has broad discretion over whether to admit or exclude evidence for violations of Rule 16, and it will be an abuse of discretion only if the nondisclosure of the evidence "prejudiced the substantial rights of the defendant."); <u>United States v. Malone</u>, 49 F.3d 393, 396-398 (8th Cir. 1995), cert. denied, 516 U.S. 877 (1995). While he may not have received copies of everything that he desires at this juncture, there is no indication that the has not been made aware of those items

Therefore, we recommend the denial of the Defendant's Motion to Suppress on this ground.

C.    The Defendant's Motion to Dismiss for Lack of Jurisdiction.

The Defendant argues that the Indictment should be dismissed for lack of jurisdiction, because our only source of jurisdiction, with respect to crimes committed on the Red Lake Indian Reservation, arises under the Major Crimes Act ("MCA"), Title 18 U.S.C. §1153, which extends Federal jurisdiction to certain enumerated crimes that are committed on Reservation lands. The Defendant contends, however, that the source of authority for the MCA is invalid, and that, absent subject matter jurisdiction, the Indictment must be dismissed in its entirety.

As argued by the Defendant, the source of Congress' power to enact the MCA is twofold: the dependent status of the Indian tribes, see United States v. Kagama, 118 U.S. 375 (1886), and the Indian Commerce Clause. See, United States v. John, 437 U.S. 634 (1978). As to the first identified source of power, the Defendant asserts that any such authority is invalid, as it is paternalistic, and the Red Lake Indian Tribe does not need to depend on the Federal Government for protection as to the crimes enumerated under the MCA. Secondly, he maintains that the crimes listed in the

_____

that fall within Rule 16.

- 23 -

MCA do not substantially affect Federal Indian Commerce and, as such, under the Supreme Court's ruling in United States v. Lopez, 514 U.S. 549 (1995), Congress lacked the authority to enact the MCA, under the Indian Commerce Clause.

The Supreme Court first addressed the Federal Government's authority, over criminal acts committed on Indian Reservations, in United States v. Kagama, supra. In Kagama, the Court upheld Congress' passage of the precursor to the MCA, and determined that the protection of Indians was a natural obligation arising from the status of Indians as "wards of the nation * * * dependent on the United States." Id. at 383. Thus, the Supreme Court has specifically held that Congress had the authority to enact legislation such as the MCA. Kagama has not been overruled, or otherwise abrogated, to date, and the holding in that case continues to serve as the governing law.

Nevertheless, the Defendant takes issue with the Supreme Court's paternalistic view, as expressed in Kagama, and contends that the view is outdated. As a consequence, the Defendant suggests that the source of Congress' authority in such criminal matters, if any there be, must arise from the Indian Commerce Clause, and he urges that the Indian Commerce Clause did not authorize the MCA's enactment. In more recent decades, the Courts have recognized that Congressional authority over

Indian Reservations does not necessarily flow from any notion of paternalism, nor

does it solely arise from the Indian Commerce Clause. Rather, the authority arises

from the complementary operation of the Indian Commerce Clause, and Article II,

Section 2, Clause 2 -- the Treaty Clause -- which are both implemented through the

broad mandate of the Necessary and Proper Clause, Article I, Section 8, Clause 18.

See, <u>McClanahan v. State Tax Commission of Arizona</u>, 411 U.S. 164, 172 (1973); see

also, <u>Montana v. Blackfeet Tribe of Indians</u>, 471 U.S. 759, 765 (1985)(recognizing

that Congress has "plenary authority over Indian affairs"). As the Court explained,

in <u>McClanahan v. Arizona State Tax Commission</u>, supra at 172 n. 7, "[t]he source of

federal authority over Indian matters has been the subject of some confusion, but it is

now generally recognized that the power derives from federal responsibility for

regulating commerce with Indian tribes and for treaty making."

    Moreover, as to the Defendant's contention that the MCA is unconstitutional,

in view of the Supreme Court's analysis in <u>United States v. Lopez</u>, 514 U.S. 549

(1995), that argument was expressly rejected by the Court of Appeals for the Ninth

Circuit, in <u>United States v. Lomayaoma</u>, 86 F.3d 142, 145 (9th Cir. 1996), cert. denied,

519 U.S. 909 (1996). The Defendant does not identify any flaw in the reasoning of

the <u>Lomayaoma</u> decision and, finding the Court's analysis there to be persuasive, we

reject the Defendant's notion that the MCA was rendered unconstitutional by <u>Lopez</u>. See also, <u>Seminole Tribe of Florida v. Florida</u>, 517 U.S. 44 (1996)(reaffirming the principle that Indian commerce is under the exclusive control of the Federal Government, and recognizing that the Indian Commerce Clause confers more extensive power on Congress than does the Interstate Commerce Clause, which was at issue in <u>Lopez</u>).

Therefore, we conclude that, not only because of the Court's holding in <u>Kagama</u>, but also the subsequent holdings with respect to Congress' authority over Indian Reservations, Congress properly exercised its authority in enacting the MCA. Accordingly, we recommend that the Defendant's Motion to Dismiss be denied, as this Court plainly has subject matter jurisdiction over the charges against the Defendant.

   D.  <u>The Defendant's Motion to Dismiss for Duplicity</u>.

    1.  <u>Standard of Review</u>.  Rule 12(b), Federal Rules of Criminal Procedure, allows our consideration, at the pretrial stage, of any defense "which is capable of determination without the trial of the general issue." To withstand a Motion to Dismiss, an Indictment must allege that the defendant performed acts which, if proven, would constitute a violation of the law under which he has been

charged.  See, <u>United States v. Polychron</u>, 841 F.2d 833, 834 (8th Cir. 1988), cert. denied, 488 U.S. 851 (1988).  As a result, if the acts, that are alleged in the Indictment, do not constitute a criminal offense, then the Indictment should be dismissed.  See, e.g., <u>United States v. Coia</u>, 719 F.2d 1120, 1123 (11th Cir. 1983), cert. denied, 466 U.S. 973 (1984).

In reviewing the sufficiency of an Indictment, or of any of its Counts, we are to determine whether the Indictment sufficiently sets forth the elements of the offenses alleged, in order to place the defendant on fair notice of the charges against him, and to enable him to raise an acquittal, or conviction, so as to prevent his double jeopardy for a single offense.  See, <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974); <u>United States v. Hernandez</u>, 299 F.3d 984, 992 (8th Cir. 2002), cert. denied, 537 U.S. 1134 (2003); <u>United States v. Fleming</u>, 8 F.3d 1264, 1265 (8th Cir. 1993).

In determining whether an Indictment has sufficiently set forth the elements of the offense charged, the Indictment will generally be deemed sufficient "'unless no reasonable construction can be said to charge the offense.'"  <u>United States v. Morris</u>, 18 F.3d 562, 568 (8th Cir. 1994), quoting <u>United States v. Peterson</u>, 867 F.2d 1110, 1114 (8th Cir. 1989); <u>United States v. Fleming</u>, supra at 1265.  In making that assessment, "[a]n indictment should be tested solely on the basis of the allegations

made on its face, and such allegations are to be taken as true." United States v. Hall,

20 F.3d 1084, 1087 (10th Cir. 1994), citing United States v. Sampson, 371 U.S. 75, 78-

79 (1962); see also, United States v. Barker Steel Co., Inc., 985 F.2d 1123, 1125 (1st

Cir. 1993); United States v. Cadillac Overall Supply Co., 568 F.2d 1078, 1082 (5th Cir.

1978), cert. denied, 437 U.S. 903 (1978).

Ordinarily, the Court's assessment is limited to the "four corners" of the

Indictment, and the Court should studiously avoid the consideration of evidence from

sources beyond the Indictment. See, United States v. Hall, supra at 1087. However,

it is permissible, and even desirable in certain circumstances, for the Court to examine

the factual predicates of an Indictment, particularly where material facts are

undisputed, in order to ascertain whether the elements of the criminal charge can be

shown. Id.; United States v. Brown, 925 F.2d 1301, 1304 (10th Cir. 1991).

2.      Legal Analysis. Strictly speaking, the Defendant does not

challenge the sufficiency of the Indictment in setting forth the crime alleged, but

instead, he claims that the allegations, which are contained in Count One, are

duplicitous, and he requests that we recommend that the Indictment be dismissed.

"'Duplicity" is the joining in a single count of two or more distinct offenses.'"

United States v. Moore, 184 F.3d 790, 793 (8th Cir. 1999), cert. denied, 528 U.S. 1161

(2000), quoting <u>United States v. Street</u>, 66 F.3d 969, 974 (8th Cir. 1995).  As such, "[t]he risk behind a duplicitous charge is that a jury may convict the defendant without unanimous agreement on a particular offense."  <u>Id.</u>; see also, <u>United States v. Street</u>, supra at 974 ("The principal vice of a duplicitous indictment is that the jury may convict a defendant without unanimous agreement on the defendant's guilt with respect to a particular offense.").  "The focus of a duplicity inquiry is whether distinct and separate 'offenses' are alleged in a single Count."  <u>United States v. Finn</u>, 919 F. Supp. 1305, 1345 (D. Minn. 1995), adopted, 911 F. Supp. 372 (D. Minn. 1995), aff'd, 121 F.3d 1157 (8th Cir. 1997), cert. denied, 522 U.S. 1113 (1998), quoting <u>United States v. Correa-Ventura</u>, 6 F.3d 1070, 1081 n.18 (5th Cir. 1993).

Count One (1) charges the Defendant with violating Title 18 U.S.C. §§113(a)(6), which provides that "[w]hoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows: Assault resulting in serious bodily injury, by a fine under this title or imprisonment for not more than ten years, or both."  In particular, the Indictment alleges that the Defendant "an Indian, did assault Baby Doe, also an Indian, resulting in serious bodily injury, to-wit: a broken arm, two broken ankles, and long bone

injuries to both legs."  According to the Defendant, Count One is duplicitous, since it includes allegations of several different injuries in a single Count.  We disagree.

Given that the victim allegedly suffered several injuries, we recognize that there is the potential that a less than unanimous Verdict could be returned, if the Jurors concluded, in less than unanimous numbers, that the Defendant was guilty of one of the charged injuries.  For example, certain of the Jurors, but less than an unanimous number, might find that the Defendant inflicted a broken arm on "Baby Doe," and other Jurors, but less than an unanimous number, might find that the Defendant inflicted two broken ankles on "Baby Doe."  While the findings of the Jury would not be unanimous as to any particular injury, there might be unanimity that the Defendant was guilty of inflicting some physical injury upon Baby Doe.  We agree with the Defendant, that he is entitled to a unanimous Verdict as to any given physical injury, but we conclude that means exist to effectively assure an unanimous Verdict.

In our view, any risk, with respect to the requirement of unanimity, can be cured by the Trial Court,  through the use of limiting instructions and Special Verdict forms, which would assure unanimity with respect to each of the injuries charged. See, United States v. Rabinowitz, 56 F.3d 932, 933 (8th Cir. 1995)("The risk of a nonunanimous jury verdict inherent in a duplicitous count may be cured by a limiting

instruction."), citing <u>United States v. Karam</u>, 37 F.3d 1280, 1286 (8th Cir. 1994), cert. denied, 513 U.S. 1156 (1995); see also, <u>United States v. Pierce</u>, 479 F.3d 546, 552 (8th Cir. 2007). The Defendant does not so much as intimate why these means would be ineffective in assuring unanimity and, having concluded that any risk that a Verdict could be less than unanimous can be fully remedied by the Trial Court, we recommend that the Defendant's Motion to Dismiss Count One, on duplicity grounds, be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.    That the Defendant's Motion to Suppress Confessions or Statements in the Nature of Confessions [Docket No. 11] be denied.

2.    That the Defendant's Motion to Suppress [Docket No. 18] be denied.

3.    That the Defendant's Motion to Dismiss the Indictment on the Grounds that the Court does not Have Subject Matter Jurisdiction [Docket No.19] be denied.

4.    That the Defendant's Motion to Dismiss the Indictment on duplicity grounds [Docket No. 22] be denied.

Dated:  January 15, 2010                        *s/Raymond L. Erickson*
                                                Raymond L. Erickson
                                                CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than January 29, 2010**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than January 29, 2010**, unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.